**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| **KENNETH SPENCER,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 2:19-cv-02825-JTF-atc** |
| | ) | |
| **BRIAN ELLER, Warden,** | ) | |
| | ) | |
| **Respondent.** | ) | |

---

**ORDER DENYING PETITION PURSUANT TO 28 U.S.C. § 2254, DENYING A
CERTIFICATE OF APPEALABILITY, CERTIFYING THAT AN APPEAL WOULD
NOT BE TAKEN IN GOOD FAITH, AND DENYING LEAVE TO PROCEED *IN
FORMA PAUPERIS* ON APPEAL**

---

Petitioner Kenneth Spencer, Tennessee Department of Correction ("TDOC") prisoner number 0047918, is an inmate incarcerated at the Northeast Correctional Complex ("NECX") in Mountain City, Tennessee.[1]  Before the Court are the operative § 2254 Petition (the "Operative Petition", *see* ECF No. 80 at PageID 1198-99); Respondent's Answer to Amended Petition For Writ of Habeas Corpus ("Answer," ECF No. 87); and Petitioner's Reply to Respondent's Answer to Amend Petition For Writ of Habeas Corpus ("Reply," ECF No. 90) filed by habeas counsel Robert Sirianni.  For the reasons stated below, the Court **DENIES** the Operative Petition.

**I.    STATE COURT PROCEDURAL HISTORY**

On February 5, 2009, a grand jury in Shelby County, Tennessee returned an indictment charging Petitioner and Kwane Morris with the first-degree premeditated murder of John Baker, in violation of Tenn. Code Ann. § 39-13-202.  (ECF No. 86-1 at PageID 1225-26.)  On October 8,

---

[1] *See* Tennessee Department of Correction, Felony Offender Information, Search - Tennessee Felony Offender Information (tn.gov) (last accessed Jan. 30, 2025).

2010, the jury returned a guilty verdict.  (*Id.* at PageID 1317.)  The court sentenced Petitioner to life imprisonment.  (*Id.* at PageID 1318.)

On November 15, 2010, Petitioner filed a notice of appeal.  (*Id.* at PageID 1323.)  Petitioner argued that: (1) the evidence was insufficient to sustain the first-degree murder conviction; (2) the trial court's incomplete statement of the law on premeditation constitutes an impermissible comment on the evidence; (3) the trial court erred in denying Petitioner's motion to suppress; and (4) the trial court erred in allowing the jury to consider evidence of prior bad acts.  (*See* ECF No. 86-13 at PageID 2415.)  On December 8, 2011, the Tennessee Court of Criminal Appeals ("TCCA") reversed the judgment of the trial court and remanded the case for a new trial.  (ECF No. 86-15 at PageID 2558, 2575.)  The TCCA concluded that the evidence was sufficient to sustain the conviction and that the trial court did not err in admitting Petitioner's statement and evidence of his alleged prior bad act.  (*Id.* at PageID 2574.)  However, the TCCA found that the trial court committed reversible error by granting the State's request for a special jury instruction on premeditation.  (*Id.* at PageID 2574-75.)  *See State v. Spencer*, No. W2010-02455-CCA-R3-CD, 2011 WL 6147012 (Tenn. Crim. App. Dec. 8, 2011) ("*Spencer I*")*.*

In August 2012, the case was retried, and Petitioner was again found guilty of first-degree murder.  (ECF No. 86-17 at PageID 2608.)  The trial court sentenced Petitioner to life in prison. (*Id.* at PageID 2609.)  Petitioner was represented by Cliff Abeles at both trials.

On December 10, 2012, Petitioner filed a notice of appeal.  (*Id.* at PageID 2614.)  Petitioner argued that: (1) the evidence was insufficient to sustain a conviction for first-degree premeditated murder and (2) the trial court erred in admitting multiple firearms and ammunition collected in two searches into evidence.  (*See* ECF No. 86-25 at PageID 3281.)  On April 10, 2014, the TCCA affirmed the judgment of the trial court.  (ECF No. 86-28.)  *See State v. Spencer*, No. W2012-

02720-CCA-R3-CD, 2014 WL 1410317 (Tenn. Crim. App. Apr. 10, 2014) ("*Spencer II*"), *perm. app. denied* (Tenn. Aug. 27, 2014) (ECF No. 86-31).

On May 5, 2014, Petitioner filed a *pro se* Petition for Post Conviction Relief in the Shelby County Criminal Court. (ECF No. 86-32 at PageID 3442-52.) On January 20, 2017, Petitioner, through appointed counsel Seth Seagraves, filed an amended petition. (*Id.* at PageID 3470-78.) The post-conviction court had an evidentiary hearing on September 8, 2017 (*see* ECF No. 86-33), and denied relief on March 14, 2018. (ECF No. 86-32 at PageID 3481-87.)

On March 26, 2018, Petitioner appealed the denial of post-conviction relief. (*Id.* at PageID 3489.) Petitioner presented two issues of ineffective assistance of trial counsel for appellate review: (1) that counsel failed to present or otherwise pursue a potential offer of twenty years to settle the case; and (2) that counsel failed to request an accomplice jury instruction for Patrick Jefferson. (*See* ECF No. 86-34 at PageID 3533.) On March 11, 2019, the TCCA affirmed. *See Spencer v. State*, No. W2018-00545-CCA-R3-PC, 2019 WL 1109831 (Tenn. Crim. App. Mar. 11, 2019) (ECF No. 86-36). The Tennessee Supreme Court ("TSC") denied permission to appeal on July 18, 2019. (ECF No. 86-39.)

## II.    THE EVIDENCE

John Baker, a fifty-five year old man, was shot and killed by Petitioner on November 7, 2008, at approximately 11:00 p.m. while sitting in his study at his home on the corner of Foyle Way and Foyle Cove East in Shelby County. Petitioner had also been involved in an earlier shooting altercation with Baker's neighbor Arsenio Delk. *Spencer I*, 2011 WL 6147012, at *1. On direct appeal, the TCCA summarized the evidence at the first trial:

> Arsenio Delk, who lived on Foyle Cove East, testified that approximately one week before the victim's death, he and his friends were at a crowded Halloween party that was being held at a neighborhood home when he accidentally stepped on or jostled the defendant, who was attending the party with his friends, including

Kwane Morris. He said that the defendant responded by pulling and cocking a .40 caliber gun at him, but he ducked back into the crowd and escaped. The defendant's response angered him, however, so when the defendant and his companions went outside, he followed and challenged the defendant to put down his gun and fight. The defendant refused to do so, and he and the defendant exchanged angry words for five to seven minutes until the defendant and his companions walked across the street to a SUV. Next, someone in the defendant's group turned on the high beams of the vehicle, which shone directly in his face. A few seconds later, some shooting started and Delk was struck in the forearm by a bullet.

Delk testified that he was unable to see who shot him because of the headlights that were in his face but that the defendant was the only individual he saw with a gun that night. He stated that his friends drove him to the hospital after the shooting, where the only information he divulged, including to the police officer who came to question him, was that he had been shot at a party. Delk explained that he did not want the police to get involved but instead wanted to "keep a grudge" and handle the situation himself. He said he changed his mind the following week after learning that the victim had been shot. According to his testimony, that night he and his friends had attempted to enter another neighborhood house party but had been turned away by the home's owner, who did not want any trouble. They then spent the night driving around the neighborhood. Delk said that when he left his home for the party, several men from the neighborhood, including one known as "Big Josh," were hanging out in a car that was parked in his cove.

Delk acknowledged that he was on probation for possession of a weapon and aggravated burglary. On cross-examination, he denied that he was armed on the night the victim was shot or that he and his friends had been searching the neighborhood for the defendant and Morris.

Dedrick Nelson, aka "Dayday," a friend of Delk's, testified that he saw the defendant and Morris shooting at Delk on the night of the Halloween party. Nelson also described the encounter between Delk and the defendant that occurred inside the home that night, stating that after Delk stepped on the defendant's foot, the two men exchanged shoves before the defendant pulled a gun on Delk. He said that on November 7, he and Delk went to another neighborhood party after first chatting with "Big Josh" and some other men, who were hanging out in a vehicle in Delk's cove. He did not see the defendant at that second party but did see Morris attempt at one point to enter the home only to be turned away by the party's hosts. On cross-examination, he denied that he and Delk spent the evening of November 7 attempting to hunt down the defendant and Morris in order to retaliate for the Halloween night shooting.

Dorothy Bond, whose Foyle Cove East home was located beside Delk's, testified that she was awakened on the night of November 7, 2008, by three loud gunshots that sounded as if they had been fired right outside her bedroom window. She responded by rolling out of bed onto the floor and calling 9–1–1. A short while

4

later, she saw a patrol car enter the cove and stop momentarily beside some cars parked beside the victim's home before continuing around the cove and exiting.

Officer Charles Stevens of the Shelby County Sheriff's Department testified that he responded to the shots-fired call sometime between 11:20 and 11:30 p.m. on November 7, 2008, to find two men in two vehicles parked on the cove. The older man, who said he had just arrived to help the younger one jumpstart his car, had not heard any gunshots. The younger one, however, indicated that he had and pointed out the direction from which they had come. Officer Stevens patrolled through the area and the surrounding neighborhood, but he was unable to locate the source of the gunshots at that time.

. . .

The victim's son, twenty-five-year-old Terrance Baker, testified that he was living with his parents and working at a restaurant at the time of the victim's death. He said the victim called him at work at about 11:00 p.m. on November 7, 2008, to tell him that someone outside the home needed a boost and to ask where his jumper cables were, but the phone call cut off in mid-sentence. Baker testified that he attempted several times to call the victim back but eventually gave up under the assumption that the victim's phone had dropped the call and the victim was either too busy to answer his call back or unable to hear his phone over his music. He stated that when he arrived home at about 2:00 a.m., he heard music playing and walked to the victim's office, where he found the victim sitting in his chair in front of the computer. He said he initially thought the victim was asleep until he shook him and his head fell over.

Eighteen-year-old Patrick Jefferson testified that on the night of November 7, 2008, he picked up the defendant and Morris and drove to a neighborhood party. When they were turned away, Morris directed him to a neighborhood street, where the defendant got out of the vehicle and walked between some houses while Jefferson and Morris stayed behind in the vehicle. Jefferson acknowledged that he warned the defendant as he was getting out of the vehicle not to do anything "hot." He refused to explain, however, what it was he feared the defendant might do. He stated that after the defendant had been gone for a minute or two, he heard a couple of gunshots. The defendant then returned to the car, and Jefferson drove them to the defendant's home.

Upon further questioning, Jefferson acknowledged that he had provided more information in his statement to police, including that Morris had pointed out Delk's house to the defendant and that he had seen the defendant in the past with a .40 caliber black and gray gun. He further acknowledged that he had received phone calls from Morris in the weeks leading up to the defendant's trial. Jefferson identified a memorandum of understanding regarding the State's use of his statement, which was signed by himself, his counsel, and the assistant district

attorney. He also identified the audio recording of the statement itself. Both were then admitted as trial exhibits and published to the jury.

In the statement, Jefferson told investigators that when he and his friends reached the November 7 neighborhood party, Morris' sister told them that Delk had been there looking for them. Morris then directed Jefferson to drive them to Delk's cove, where he pointed to a car parked on the street and announced that he thought Delk was inside. According to Jefferson, Morris instructed him to turn the corner and pull over and then told the defendant that he had better get Delk before Delk got him or his family. At that point, the defendant got out of the car and began walking through a cut between the houses. Five minutes later, Jefferson heard three or four gunshots. Next, the defendant returned to the car and Jefferson drove them to the defendant's home.

Recarlous Brown testified that on the night of November 7, 2008, he, Josh Cole, and a third friend named Calvin stopped in Cole's car in the area of Foyle Way in southeast Shelby County to visit some of Cole's friends, including one whose first name was Arsenio. After Arsenio and his companions left, Cole discovered that his car battery was dead. At about that time, the victim came home and attempted to locate some booster cables in his vehicle and house to jumpstart Cole's vehicle. He was unable to find any, however, and returned to his home.

In the meantime, Cole had called another friend nicknamed "Big Robert," who arrived in his vehicle to attempt to help. Brown testified that "Big Robert" was about to drive him home so that he could retrieve some jumper cables when a car with lightly-tinted windows came down the street. He said the car attracted his attention because it appeared to have at least five individuals inside and was moving "too slow." The driver drove around the cove, pulled behind "Big Robert's" and Cole's vehicles, paused for a few seconds, drove back beside them, and then turned the corner. A couple of minutes later, Brown heard five gunshots, including one that ricocheted off Cole's rear windshield.

Brown testified that when the shooting stopped, "Big Robert" gave him and his companions a ride home in his vehicle. After he learned of the victim's death, Brown went downtown to the homicide office, where he gave a statement and identified the driver of the slow-moving vehicle from a photographic lineup.

Robert Adams, aka "Big Robert," testified that on the night of November 7, 2008, he and a friend stopped to visit another friend, Reggie, who lived on Foyle Cove East. When they arrived, they saw Josh Cole and two of Cole's friends, who were stopped in Cole's vehicle near the victim's home. Adams said that Reggie and the victim each searched their respective homes for booster cables to help Cole start his car, but neither had any. He stated that he was still sitting in his vehicle talking to Cole when a car slowly pulled in the cove, paused briefly behind Cole's car, and then circled around the cove and left. A couple of minutes later, Adams heard three

or four gunshots, including one that ricocheted off Cole's car. Afterwards, he drove everybody home.

Joshua Cole testified that on the night of November 7, 2008, he and three friends drove in his car to visit Terrance Baker at his home. While he was waiting in front of the Baker home for Terrance to come home from work, he saw and briefly chatted with his friend, Arsenio Delk. Delk left, and he then tried to start his own car only to find out that the battery was dead. His friend, Robert Adams, drove up, and Adams and the victim each searched unsuccessfully for some booster cables to jumpstart his car. As they did so, Cole heard four gunshots, one of which ricocheted off Cole's car. Afterwards, Adams drove Cole home, where Cole collected some jumper cables and then returned to the cove with his father to retrieve his car.

Officer Mark Thompson of the Shelby County Sheriff's Department, the first officer to respond to the victim's home, testified that by the time he arrived the medical personnel had determined that they could do nothing for the victim.

Dr. Marco Ross, a forensic pathologist and the deputy chief medical examiner for the Shelby County Medical Examiner's Office, testified that the victim was killed by a single gunshot wound to the back of [the] head.

Detective Robert Butterick of the Shelby County Sheriff's Department testified that he found a bullet hole in the window of the victim's office with a corresponding hole in the curtain covering the window. After using a rod to establish the bullet's trajectory, he began searching the area between two neighboring houses at the end of the cove and discovered three fired shell casings at the base of the wall of one of the houses. He also found a bullet in a telephone junction box in front of the house.

Detective Butterick later executed search warrants at both the defendant's home and Morris' home. During the execution of the first search warrant, which occurred at the defendant's home on November 13, 2008, he found and seized a number of firearms and ammunition, including the following items: a pellet pistol, a .22 caliber pistol, and a .32 caliber semi-automatic pistol. The subsequent search of Morris' home resulted in the seizure of ammunition and two semi-automatic weapons—a black and silver/gray .40 caliber Smith and Wesson handgun and a black and silver/gray .380 Bryco handgun. Each weapon contained live rounds of ammunition in the magazine but none in the chamber. Detective Butterick testified that the ballistics evidence found at the crime scene, a bullet fragment recovered from Arsenio Delk's arm, bullet fragments recovered from the victim's body, and a number of the items seized as a result of the search warrant were submitted to the Tennessee Bureau of Investigation ("TBI") laboratory for analysis.

TBI Special Agent Forensic Scientist Tommy Heflin, an expert in firearms examination, testified that the three cartridge cases recovered from East Foyle Way Cove were all fired from the Smith and Wesson .40 caliber pistol. He said that the fired bullets recovered from the victim's head, the cove, and Arsenio Delk's arm

were all consistent in shape, type, and design with the live rounds that were loaded in the .40 caliber gun, but they were too damaged for him to conclusively determine that they had been fired from that gun.

Detective Matthew Keaton of the Shelby County Sheriff's Department testified that the defendant and Morris were developed as suspects based on information received from Arsenio Delk and other witnesses about the Halloween night shooting. He described his two interviews with the defendant and the techniques he and Detective Robertson employed in the second interview to get the defendant to reveal the truth about the November 7 shooting, testifying that when the defendant at some point made a religious reference, Detective Robertson realized that they could use the defendant's religious beliefs to help them "get to the truth." They, therefore, held hands and prayed with the defendant after first asking him if it would be all right for them to do so. Detective Keaton testified that it was neither the first time, nor the last, for the officers to employ such tactics.

In the statement, which was played for the jury, the defendant admitted that he had shot toward two cars near the victim's house under the belief that Arsenio Delk was inside one of them.[2] He claimed, however, that he was just trying to scare Delk and the other occupants of the vehicles.

. . .

The defendant testified that he and Delk exchanged shoves at the Halloween party, were thrown out by the home's owner, and subsequently argued outside in the street. He denied, however, that he had a gun that night. Instead, he said that he began gathering his companions to leave after he saw Delk's friend, "Dayday," with a dark object by his side that appeared to be a handgun. According to the defendant, he had just opened the door to his friend's truck when gunshots erupted from different directions. He stated that, to his knowledge, none of the gunshots were fired by any of his companions. Later that night, however, he began receiving multiple threats regarding the shooting via his cell phone and his "MySpace" page.

The defendant further testified that on the night of November 7, 2008, he, Morris, and Jefferson attempted to enter the neighborhood house party but were turned away because it was too full. As they were leaving, they passed Delk's cove. Morris informed Jefferson that Delk lived there and Jefferson then drove them through the cove, in the process passing two cars that were stopped on the street. They then exited the cove, and Morris directed Jefferson to a cut or pathway between houses that led back to Delk's cove. The defendant said that he got out of the vehicle, ran through the cut to the cove, and started aimlessly shooting his gun with the intention of scaring the individuals in the vehicles. He described his actions:

---

[2] Petitioner's statement was an exhibit at trial. (*See* ECF No. 86-12 at PageID 2333-78.)

> Well, we had got to the pathway, and when we got to the pathway, I had just jumped out the car, and I ran to the cove. When I got to the cove, I just drew my gun up and I just started shooting, carelessly. I wasn't aiming towards nothing. I [wasn't] aiming directly at nothing. I was just shooting carelessly. And I had r[u]n back to the car and jumped in the car. And we left.

> The defendant insisted that he had no intention of shooting Delk or anyone else and expressed his remorse at the death of the victim. On cross-examination, he acknowledged that the gun he used in the shooting was his but denied that he retrieved it for the purpose of shooting Delk.

*Spencer I*, 2011 WL 6147012, at *2-7.

On direct appeal after the second trial, the TCCA summarized evidence relevant to premeditation:

> On Halloween night in 2008, Antonio Delk attended a party in his neighborhood. While at the party, he accidentally bumped into Appellant. The two men began pushing each other. Appellant pulled out a gun. The altercation moved outside along with several bystanders. Delk heard his friend say "KJ, you know what it is." KJ referred to Kwane Morris, who was with Appellant. Almost immediately, Delk heard gunshots, and he was hit in the forearm. Delk's friend, Dedrick Nelson, saw Appellant and Morris shooting guns. Delk went to the hospital where a bullet was removed from his arm.

> On November 7, 2008, Delk and a friend attempted to go to a party on Harvest Knoll. They were denied entry. Nelson saw Morris at the party. He returned to his home on East Foyle Cove. When he arrived on his street, he saw some people he knew, including "Big Rob" Cole, parked on the street. Delk spoke with them and then drove away.

> On November 7, 2008, Jefferson drove his Lincoln to a party on Harvest Knoll. He was accompanied by K.J. Morris and Appellant. When they arrived, the party was full. They left the party and Jefferson drove through the neighborhood following Morris's directions. Morris was telling Jefferson how to get to Delk's house. When they arrived on Delk's street, someone in the car pointed out Delk's house or car. Jefferson saw two cars parked in the street, but he drove past them. However, Morris said that Delk was with the two cars. After driving down the street, Jefferson pulled over to text his girlfriend. Appellant got out of the car. Jefferson said, "Don't do nothing crazy." Jefferson testified that he had a bad feeling about Appellant getting out of the car. Jefferson saw Appellant walk away from the car towards the houses. Shortly thereafter, Jefferson heard a couple of gunshots. Appellant ran back to the car, and Jefferson drove to Appellant's house.

Detective Sergeant Matthew Keaton with the Shelby County Sheriff's Office
interviewed Appellant twice as part of his investigation of the shooting death of the
victim. At the second interview, Appellant told Detective Keaton that "he went out
with the intention that night, in his own statement, to kill Arsenio Delk, to get
Arsenio Delk."

See *Spencer II*, 2014 WL 1410317, at *3-4.

## III.    THE FEDERAL HABEAS PROCEEDINGS

On November 29, 2019, Petitioner, through habeas counsel Robert Golder, filed a Petition
for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254. (ECF No. 1.) Petitioner alleged that:
(1) his trial counsel was ineffective for failing to pursue a potential plea offer of a 20-year sentence;
(2) trial counsel was ineffective for omitting a jury instruction on accomplice testimony; and (3)
Petitioner's Fifth Amendment right to due process was violated by the admission of prejudicial
firearms and ammunition that were unrelated and irrelevant to the offense charged. (*Id.* at PageID
4-7.) On April 15, 2020, the Court directed Petitioner to pay the habeas filing fee or file an *in
forma pauperis* affidavit. (ECF No. 8.) On July 22, 2020, the Court dismissed the case without
prejudice for failure to comply with the Court's April 15, 2020 order (ECF No. 9) and entered
judgment in the case (ECF No. 10).

On October 13, 2020, Petitioner filed a *pro se* motion to amend the petition and his
proposed amended petition. (ECF Nos. 12 & 13.) Petitioner also moved the Court for withdrawal
or removal of Golder from his case for failure to file and argue certain issues. (ECF No. 15.) On
December 3, 2020, the Court removed Golder as counsel and allowed Petitioner to proceed *pro se*.
However, the Court denied the motion to amend because Petitioner had not complied with the
Court's April 15, 2020 order which required Petitioner to pay the habeas filing fee or file an *in
forma pauperis* affidavit. (*See* ECF No. 17 at PageID 285-286.) The Court advised that "Spencer
has not filed a motion for relief from judgment under Rule 60(b) of the Federal Rules of Civil

Procedure.  Unless he does so, and the motion is granted, he cannot file an amended pleading."
(*Id.* at 286.)  On December 30, 2020, Petitioner paid the habeas filing fee.  (ECF No. 21.)
Thereafter, the Court issued a series of directives for Petitioner to sign his motions, submit factual
affidavits, and serve Golder (*see* ECF Nos. 22 and 32).  Ultimately, the Court struck certain filings
(ECF No. 24).  The Court then appointed Lee Gerald as counsel for Petitioner and held a hearing
on April 28, 2022, on Petitioner's Rule 60(b) motion.  (*See* ECF No. 51 & 70.)  The Court allowed
post-hearing briefs.  (*See* ECF Nos. 68, 71 & 74.)

Robert Sirianni filed "Petitioner's Supplemental Memorandum of Law And Fact" on
February 16, 2023.  (ECF No. 76.)  On March 30, 2023, Robert Sirianni entered an appearance as
counsel for Petitioner.  (ECF No. 77.)  On April 20, 2023, Gerald was allowed to withdraw as
counsel.  (ECF No. 79.)

In an Order dated June 18, 2024, the Court denied Petitioner's Rule 60(b) motion as moot,
denied the sanctions motions, and granted in part and denied in part Petitioner's motion to amend.
(ECF No. 80.)  The Court, after considering Spencer's *pro se* amended petition (ECF No. 13),
determined that the claims which related back to the timely counseled habeas petition (ECF No.
1) form the basis of the Operative Petition (*see* ECF No. 80 at PageID 1190-99) in this case.  The
claims in the Operative Petition are as follows:

(a) IAC-Plea Offer Claim, alleging that trial counsel Abeles rendered IAC in violation of
Petitioner's Sixth Amendment rights by "fail[ing] to pursue [an] advantageous plea
offer … of a 20-year sentence prior to the first trial or between the two trials" (ECF
No. 1 at PageID 4; *see* ECF No. 13 at PageID 467; *see also* ECF No. 13-1 at 548-53);

(b) IAC-Jury Instruction Claim, alleging that Abeles rendered IAC in violation of
Petitioner's Fifth, Sixth, and Fourteenth Amendment rights by "fail[ing] to seek a jury
instruction on accomplice testimony" (ECF No. 1 at PageID 5; *see* ECF No. 13 at
PageID 466; *see also* ECF No. 13-1 at PageID 548-53); and

(c) Due Process Claim, alleging that the trial court violated Petitioner's Fifth Amendment
right to due process by "admi[tting] prejudicial firearms and ammunition that were

unrelated and irrelevant to the alleged offense" (ECF No. 1 at PageID 7; *see* ECF No. 13 at PageID 466; *see also* ECF No. 13-1 at PageID 544-47).

The Court directed Respondent to file a response to the Operative Petition. (ECF No. 80 at PageID 1180, 1200.) On August 5, 2024, Respondent filed the state court record. (ECF No. 86.) On August 15, 2024, Respondent filed his Answer. (ECF No. 87.) Petitioner filed a Reply on October 28, 2024. (ECF No. 90.)

## IV.   THE LEGAL STANDARD

Federal courts have authority to issue habeas corpus relief for persons in state custody under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

### A.  Exhaustion & Procedural Default

A federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has exhausted available state remedies by presenting the same claim sought to be redressed in a federal habeas court to the state courts. 28 U.S.C. § 2254(b) & (c); *see Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The petitioner must "fairly present"[3] each claim to all levels of state court review, up to and including the state's highest court on discretionary review, *Baldwin v. Reese*, 541 U.S. 27, 29 (2004), except where the state has explicitly disavowed state supreme court review as an available state remedy, *O'Sullivan v.*

---

[3] For a claim to be exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (internal citations omitted). Nor is it enough to make a general appeal to a broad constitutional guarantee. *Gray v. Netherland*, 518 U.S. 152, 163 (1996).

*Boerckel*, 526 U.S. 838, 847-48 (1999).  Tennessee Supreme Court Rule 39, effective June 28, 2001, eliminated the need to seek review in the Tennessee Supreme Court to "be deemed to have exhausted all available state remedies."  *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003); *see Smith v. Morgan*, 371 F. App'x 575, 579 (6th Cir. 2010) ("*Adams* not only requires the federal courts to ensure that the state courts have the first opportunity to review and evaluate legal claims . . . but also mandates that the federal courts respect the duly-promulgated rule of the Tennessee Supreme Court that recognizes the law and policy-making function of that court and the court's desire not to be entangled in the business of simple error correction").

The procedural default doctrine is ancillary to the exhaustion requirement.  *See Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine).  If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977); *see Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment") (internal quotation marks and citation omitted).[4]  In general, however, "we may only treat a state court order as enforcing the procedural default rule when it unambiguously relied on that rule."  *Peoples v. Lafler*, 734 F.3d 503, 512 (6th Cir. 2013).  If a claim has never been

---

[4] The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits.  *Walker*, 562 U.S. at 315.  A state rule is an "adequate" procedural ground if it is "firmly established and regularly followed."  *Id.* at 316 (quoting *Beard v. Kindler*, 558 U.S. 53, 60-61 (2009)).  "A discretionary state procedural rule . . . can serve as an adequate ground to bar federal habeas review . . . even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others."  *Id.* (quoting *Kindler*, 558 U.S. at 54.) (internal citations & quotation marks omitted).

presented to the state courts, but a state court remedy is no longer available (e.g., when an applicable statute of limitations bars a claim), the claim is technically exhausted, but procedurally barred.  *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991); *see Robertson v. Fender*, No. 20-4215, 2021 WL 1978359, at *2 (6th Cir. Apr. 28, 2021).[5]

Under either scenario, a petitioner must show cause to excuse his failure to present the claim and actual prejudice stemming from the constitutional violation or, alternatively, that a failure to review the claim will result in a fundamental miscarriage of justice.  *Schlup v. Delo*, 513 U.S. 298, 320-21 (1995); *Coleman*, 501 U.S. at 750.  The latter showing requires a petitioner to establish that a constitutional error has probably resulted in the conviction of a person who is actually innocent of the crime.  *Schlup*, 513 U.S. at 321; *see House v. Bell*, 547 U.S. 518, 536-39 (2006) (restating the ways to overcome procedural default and further explaining the actual innocence exception).

## B.  Merits Review

Where a claim has been adjudicated on the merits in state court, the writ is only granted if the adjudication:

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).  The petitioner carries the burden of proof for this "difficult to meet" and "highly deferential [AEDPA] standard," which "demands that state-court decisions be given

---

[5] To avoid procedural default, federal law requires a federal habeas petitioner in Tennessee to present his federal claims to the Tennessee Court of Criminal Appeals.  *Covington v. Mills*, 110 F. App'x 663, 665 (6th Cir. 2004).

the benefit of the doubt." *Pinholster*, 563 U.S at 181 (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011), and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).  Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.  *Pinholster*, 563 U.S. at 181-82, 185.

A state court's decision is "contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 41213 (2000).[6]  An "unreasonable application" of federal law occurs when the state court "identifies the correct governing legal principle from" the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  The state court's application of clearly established federal law must be "objectively unreasonable" for the writ to issue.  *Id.* at 409.  The writ may not issue merely because the habeas court, in its independent judgment, determines that the state court decision applied clearly established federal law erroneously or incorrectly.  *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citing *Williams*, 529 U.S. at 411).  "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Harrington*, 562 U.S. at 103.

As for challenges under §2254(d)(2), "when a federal habeas petitioner challenges the factual basis for a prior state-court decision rejecting a claim, . . . [t]he prisoner bears the burden of rebutting the state court's factual findings 'by clear and convincing evidence.'"  *Burt v. Titlow*,

---

[6] The "contrary to" standard does not require citation of Supreme Court cases "so long as neither the reasoning nor the result of the state-court decision contradicts them."  *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).

571 U.S. 12, 18 (2013) (quoting 28 U.S.C. § 2254(e)(1)).  A state court factual determination is not "unreasonable" merely because the federal habeas court would have reached a different conclusion.  *Wood v. Allen*, 558 U.S. 290, 301 (2010); *see also Rice v. Collins*, 546 U.S. 333, 341-42 (2006) ("Reasonable minds reviewing the record might disagree" about the factual finding in question, "but on habeas review that does not suffice to supersede the trial court's . . . determination.").[7]  The Supreme Court has described this standard as "demanding but not insatiable" and has emphasized that "deference does not by definition preclude relief."  *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (internal quotation marks and alteration omitted).

## V.    ANALYSIS OF PETITIONER'S CLAIMS

### A.  INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner's ineffective assistance of trial counsel claims are controlled by the standards stated in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), which require a showing that "counsel's performance was deficient" and that "the deficient performance prejudiced the defense."  To establish deficient performance, a person challenging a conviction "must show that counsel's representation fell below an objective standard of reasonableness."  *Id.* at 688.  A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range of reasonable professional assistance."  *Id.* at 689.  The

---

[7] In *Wood*, the Supreme Court granted certiorari to resolve whether, to satisfy § 2254(d)(2), "a petitioner must establish only that the state-court factual determination on which the decision was based was '"unreasonable,"' or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence."  *Wood*, 558 U.S. at 299.  The Court ultimately found it unnecessary to reach that issue, and left it open "for another day."  *Id.* at 300-01, 303 (citing *Rice*, 546 U.S. at 339, in which the Court recognized that it is unsettled whether there are some factual disputes to which § 2254(e)(1) is inapplicable).  In *Burt*, 571 U.S. at 18, the Supreme Court applied § 2254(e)(1)'s "clear and convincing" standard but cautioned that "[w]e have not defined the precise relationship between § 2254(d)(2) and § 2254(e)(1), and we need not do so here."

challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690).

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding. Counsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Richter*, 562 U.S. at 104 (internal quotation marks and citation omitted); *see id.* at 111-12 ("In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. . .. The likelihood of a different result must be substantial, not just conceivable.") (citations omitted); *Wong v. Belmontes*, 558 U.S. 15, 27 (2009) (per curiam) ("But *Strickland* does not require the State to 'rule out' [a more favorable outcome] to prevail. Rather, *Strickland* places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different").

On post-conviction appeal, the TCCA considered Petitioner's claims of ineffective assistance of trial counsel, cited and applied the *Strickland* standard. *Spencer III*, 2019 WL 1109831, at *3-5. The TCCA opined,

> The Petitioner argues on appeal that trial counsel was ineffective for not pursing and communicating the 20-year informal offer to the Petitioner and for not

requesting an accomplice jury instruction in order to argue an accomplice theory at trial. The Petitioner asserts that there would have been "nothing harmful from arguing an accomplice theory other than the prejudice to [the Petitioner] from not doing so."

In its detailed written order denying the petition, the post-conviction court noted, among other things, the Petitioner's own admission that the 20-year offer was not an official offer and trial counsel's testimony that the Petitioner was uninterested when he met with him about the unofficial offer. The court also accredited the testimony of trial counsel that the Petitioner was completely uninterested in any kind of plea that involved second degree murder, and the State was uninterested after the first trial in even attempting to negotiate a settlement of the case. The court further found that counsel's decision not to request an accomplice jury instruction with respect to Mr. Jefferson's testimony was a matter of sound trial strategy.

The record fully supports the findings and conclusions of the post-conviction court. Trial counsel's testimony, which was accredited by the post-conviction court, was that he communicated the unofficial offer to the Petitioner, who was uninterested in a settlement that involved a plea to second degree murder. According to trial counsel, the only kind of plea in which the Petitioner was interested was one involving a two to four-year sentence for either criminally negligent or reckless homicide, and he sent counsel multiple letters to that effect. Trial counsel also provided a reasonable explanation for not requesting an accomplice jury instruction with respect to Mr. Jefferson, testifying that he believed such an instruction would have only served to bolster Mr. Jefferson's weak testimony and hurt their defense by underscoring the Petitioner's own damaging statement, which corroborated Mr. Jefferson's account. The Petitioner has not shown that counsel's failure to request the accomplice jury instruction was not part of a sound trial strategy or that counsel failed to present or pursue any offers to the Petitioner. Accordingly, we affirm the denial of the petition for post-conviction relief.

*Id*. at *4.

## 1. Plea Offer

Petitioner alleges that he was denied his Sixth Amendment right to the effective assistance of counsel by his trial counsel's failure to pursue an informal offer of a 20-year sentence before the first trial or between the first and second trials. (ECF No. 1 at PageID 4.) Petitioner acknowledges that he rejected an offer of a 25-year sentence. (*Id.* at PageID 4-5.) However, Petitioner contends that he was not informed about an informal 20-year offer made by prosecutor

Amy Weirich, then the leader of the Gang Unit, or that Weirich would be willing to discuss the offer with the victim's family if Petitioner signed paperwork stating his intent to accept the offer. (*Id.* at PageID 5; *see* ECF No. 86-33.)  Petitioner contends that he did not become aware of this informal offer until after the first trial and that he would have accepted the offer if he had known about it.  (ECF No. 1 at PageID 5.)

Petitioner asserts that the TCCA's decision was objectively unreasonable when it determined that his trial counsel was effective "despite failing to pursue and communicate the actual benefits of the 20-year informal offer."  (ECF No. 13-1 at PageID 548.)  Petitioner argues that, to consider the TCCA's decision reasonable, the habeas court would have to conclude that trial counsel "would not have advised Petitioner's family that [Petitioner] definitely needed to accept the 20 year, instead of facing the very real possibility of yet another 51 year sentence imposition."  (*Id.* at PageID 549.)  Petitioner contends the Court would have to accept that it was reasonable for trial counsel "not to go to the family of [Petitioner] and explain the actual benefits of having [Petitioner] accept the twenty year offer when Counsel understood that this would have been the decisive factor in getting Petitioner Spencer to have accepted the plea."  (*Id.* at PageID 549-50.)

The TCCA summarized the evidence presented at the post-conviction hearing about the 20-year informal plea offer:

> Trial counsel testified that the prosecutor told him if he "signed for twenty" she would "take it to the family."  She made it clear, however, that it was not an official offer and that she not only had to obtain the approval of the family but also had to "go up the chain of command and get it approved" in her office.  Trial counsel said that he visited the Petitioner a short time later, who told him that he was "not interested at all" in the offer and did not want to plead to second degree murder "of any kind."  Based on the conversations he had with the Petitioner about transferred intent, the Petitioner appeared to be in denial about his role in the victim's death and did not believe he was guilty of second degree murder.  The Petitioner, instead, wanted an offer on criminally negligent homicide, reckless homicide, or possibly

voluntary manslaughter.  The Petitioner sent trial counsel several letters to that effect during the course of counsel's representation in the first trial, "indicating ... that [the Petitioner] would only plead to two to four years of either criminally negligent or reckless homicide."

Trial counsel testified that there was only a "very short window" during which the informal 20-year offer was a possibility.  Afterwards, he was never even approached with a second degree murder offer.  By the time the case was remanded for retrial, the lead prosecutor had moved up to Deputy District Attorney.  When trial counsel broached the subject of a possible second degree murder plea with the new prosecutors assigned to the case, the "door shut in [his] face as far as any offer was concerned."  Trial counsel said that the district attorney's office knew after the first trial that it had a strong case, and it was made clear to him that an offer would never emerge.

*Spencer III*, 2019 WL 1109831, at *2-3.  The TCCA noted Petitioner's admission that the 20-year offer was unofficial and that Petitioner was not interested when counsel met with him about the unofficial offer.  *Id.* at *4.  The post-conviction court credited trial counsel's testimony that Petitioner was "completely uninterested in any kind of plea that involved second degree murder" and that the State lost interest in a plea after the first trial.  *Id.*  The TCCA, based on trial counsel's testimony, determined that Petitioner was only interested in a plea with a two-year to four-year sentence for criminally negligent or reckless homicide and that Petitioner had sent letters to that effect.  *Id.*

Respondent argues that the TCCA reasonably applied federal law and reasonably determined the facts in the light of the evidence presented when it denied Petitioner post-conviction relief.  (ECF No. 87 at PageID 3619.)  Respondent points to Petitioner's testimony that his trial counsel presented Petitioner with an offer of a 25-year sentence at 100%.  (ECF No. 87 at PageID 3621.)  Respondent notes that Petitioner initially said that he was *not* interested in the offer, and then said that he was interested, but Petitioner did not accept the offer because his parents talked him out of it.  (ECF No. 87 at PageID 3621; *see* ECF No. 86-33 at PageID 3498.)

In reply, Petitioner argues that trial counsel failed to convey the unofficial 20-year offer to Petitioner and Petitioner is serving a life sentence because of counsel's failure. (ECF No. 90 at PageID 3645.) Petitioner contends that not conveying the offer is "an egregious lack of reasonable assistance of counsel" and that the state court did not reasonably determine the facts in light of the evidence presented. (*Id.*) Petitioner contends that evidence "was sufficiently presented to determine that the offer was not properly communicated." (*Id.* at PageID 3645-46.)[8]

At the post-conviction hearing, Petitioner testified that he was interested in the 25-year offer, but his parents talked him out of it. (ECF No. 86-33 at PageID 3498-99.) Petitioner said that he would have taken a lower offer. (*Id.* at PageID 3499.) He claimed he did not find out about the unofficial 20-year offer until he saw a paper about it in when he got his trial transcripts and discovery packet. (*Id.* at PageID 3499-3501.)

Abeles testified that he discussed the potential for settlement with Weirich when they were going over discovery and the motion to suppress. (ECF No. 86-33 at PageID 3507-08.) Abeles said that they had a "loose conversation, sort of a feeling out process, and basically what she left me with was[,] if you sign for twenty[,] I'll take it to the family," but the offer would have to be approved up the chain of command. (*Id*. at PageID 3508.) Abeles contends that he went to Petitioner shortly after the meeting and conveyed this information and that Petitioner "was not interested at all in that meeting and that offer." (*Id.* at PageID 3509.) Petitioner "did not want to take a murder 2 of any kind." (*Id.*) Abeles said that Petitioner was eighteen years old at the time

---

[8] Petitioner also contends that the sentence is unreasonable given Petitioner's age at the time of the incident. (ECF No. 90 at PageID 3646.) Petitioner asserts that he has rehabilitated himself and changed the course of his life, and he argues that young adults are less morally culpable due to their developmental and neurological traits. (*Id.* at PageID 3646-48.) These arguments are being raised for the first time more than four years after the habeas petition was filed. The claim is not exhausted, untimely and will not be considered by the Court.

of the offense, and "in his mind this case was still a reckless homicide, and that's all he ever wanted to take." (*Id.*) Abeles testified that Petitioner "would in no way take fifteen, twenty or even twenty-five years." (*Id.*) Shortly, after the visit, Abeles received several letters to that effect. (*Id.* at PageID 3509, 3523.) Petitioner was "never interested in taking a murder 2 at all." (*Id.* at PageID 3510.) Abeles indicated that it was "a very short window" for Petitioner to declare his interest in the unofficial 20-year offer. (*Id.*) Abeles said that, at the point of filing a motion to suppress in a first degree murder case, the standard practice is that there will be no more settlement negotiations, and that is what happened in Petitioner's case. (*Id.* at PageID 3510-11.)

Abeles testified that, after the first appeal, he tried to settle for second-degree murder. (*Id.* at PageID 3511-12.) But, "the door shut in my face as any offer was concerned." (*Id.* at PageID 3512.) Abeles said that a settlement "was an impossibility at that point in time. They knew that they had a pretty strong case" and were "not going to approve a settlement of this case when they'[v]e already gotten [a] convict[ion]." (*Id.*) Weirich told Abeles that herself. (*Id.* at PageID 3523-24) Abeles noted that the appeal was not helpful to Petitioner because it did not eliminate any proof and was based on a technicality on the jury instruction. (*Id.* at PageID 3512.)

Abeles testified that he met with Petitioner thirty-two times in jail and at numerous court settings. (*Id.* at PageID 3513.) Abeles discussed the defenses, elements of the crime, elements of lesser included offenses, as was Abeles' practice in any first degree murder case. (*Id.*) But, "Spencer was very, very adamant about not taking a murder 2" and was concerned about getting back to his family. (*Id.* at PageID 3514.) Abeles said that Petitioner "was in denial" and that this was a case of transferred intent "where, you know, in a darkened cove Mr. Spencer, now convicted, was alleged to have darted between some houses, fired shots across the cove randomly at people at the cove who allegedly maybe Mr. Delk could have been one of those people." (*Id.*) Abeles

22

said, "I don't think that Mr. Spencer every truly was ever – even at trial I don't believe he ever

would have taken a murder 2 up to the first trial." (*Id.*)

The Sixth Amendment right to counsel extends to the plea-bargaining process. *Lafler v.

Cooper*, 566 U.S. 156, 162 (2012). Defense counsel has the duty to communicate formal offers

from the prosecution to accept a plea on terms and conditions that may be favorable to the accused.

*Missouri v. Frye*, 566 U.S. 134, 145 (2012). Petitioner must show that he would have accepted

the offer, the prosecution would not have rescinded the offer, and that the trial court would not

have rejected the plea agreement. *See Lafler*, 566 U.S. at 168; *Frye*, 566 U.S. at 148–49, 132 S.Ct.

1399; *see Byrd v. Skipper*, 940 F.3d 248, 257 (6th Cir. 2019).

Plea agreements are contractual in nature. *See United States v. Robison*, 924 F.2d 612, 613

(6th Cir. 1991). A formal offer requires that "its terms and its processing can be documented so

that what took place in the negotiation process becomes more clear if some later inquiry turns on

the conduct of earlier pretrial negotiations." *See Frye*, 566 U.S. at 146. The terms that are relevant

for a formal offer are whether defendant would cooperate; whether a specific sentence will be

recommended; or whether a charge would be reduced or dismissed. *Villa v. United States*, No.

4:13-CR-00033-GNS-HBB-1, 2024 WL 4491823, at *4 (W.D. Ky. Oct. 15, 2024), *app. filed*, No.

24-5973 (6th Cir. Oct. 28, 2024); *see Ramirez v. United States*, 751 F.3d 604, 608 (8th Cir. 2014)

(an informal plea offer contains no promises or assurances).

Petitioner admits that the offer was "unofficial." The terms had not yet been defined, and

it is unclear whether either the victim's family or the prosecutor's supervisor would accept a plea

in exchange for a 20-year sentence. This was not a formal offer, as contemplated in *Frye*. *Frye*

leaves unsettled the question of what, if any, duty remains on trial counsel with an informal plea

offer. *See Robinson v. United States*, No. 3:13-CR-71-TAV-HBG-6, 2020 WL 5805513, at *4

(E.D. Tenn. Sept. 29, 2020); *see Villa*, 2024 WL 4491823, at *4 (Counsel simply cannot be ineffective where no formal offer was made). There is no clearly established Supreme Court precedent that extends *Frye* to informal plea offers, such as the one in Petitioner's case.

The post-conviction court and the TCCA credited Abeles' detailed testimony about the informal offer, that Abeles conveyed the offer to Petitioner, and that Petitioner did not want to accept a plea for second-degree murder. Petitioner failed to show that: (1) Abeles did not communicate the informal plea offer, (2) Abeles did not explain to Petitioner the elements of the crime, possible defenses, lesser included offenses, or sentence exposure; or (3) that Petitioner would have taken a 20-year plea offer if it had been formally made, given Petitioner's own testimony that his parents talked him out of a 25-year deal and evidence that Petitioner did not want to plead to second-degree murder. Petitioner has not shown that the TCCA's factual determinations based on the evidence presented at the post-conviction hearing were unreasonable.

The TCCA determined that trial counsel's performance was reasonable; Petitioner did not show that counsel failed to present or pursue offers of settlement. *See Spencer III*, 2019 WL 1109831, at *3-4. The TCCA's decision was not contrary to or an unreasonable application of clearly established Supreme Court precedent or based on an unreasonable determination of facts in light of the evidence presented. Petitioner's ineffective assistance of counsel claim about the plea offer is without merit.

### 2. Accomplice Jury Instruction

Petitioner alleges that he was denied his Sixth Amendment right to the effective assistance of counsel. He claims that trial counsel failed to request a jury instruction on accomplice testimony, which resulted in the denial of a complete and accurate charge of the law. (ECF No. 1 at PageID 5.) Petitioner asserts that Patrick Jefferson drove Petitioner to Delk's house, knowing

that Petitioner had shot Delk a week earlier. (*Id.* at PageID 6.) Petitioner asserts that the Tennessee Pattern Jury Instruction for accomplice testimony states that the testimony of an accomplice must be corroborated independently to confirm the identity and the alleged conduct of the accused. (*Id.*) Petitioner contends that his *mens rea* was the primary issue for the jury's consideration and that Jefferson was the only witness who was with Petitioner before the shooting. (*Id.*) Petitioner asserts that Jefferson's testimony was not corroborated with objective evidence or eyewitness testimony. (*Id.*) Petitioner argues that an instruction on accomplice testimony would have limited the jury's reliance on unreasonable and unverifiable information. (*Id.*) Petitioner raised this claim in his petition for post-conviction relief and on post-conviction appeal. (*Id.* at PageID 5.)

Petitioner alleges that the TCCA reached a decision that involved an unreasonable application of *Strickland* and was based on an unreasonable determination of fact when it found that Abeles was effective despite failing to require an accomplice jury instruction. (ECF No. 13-1 at PageID 548; ECF No. 90 at PageID 3648-50.) Petitioner asserts that "this habeas court would have to infer that it's "… reasonable…" to conclude that Counsel Abeles thoroughly and meticulously explained to Petitioner Hearing having Mr. Patrick Jefferson, a state star witness, credibility severely damaged by telling the jury that he was in fact criminally responsible and liable for the death of Mr. Baker, an accomplice, was sound trial strategy that some how helped the defense." (ECF No. 13-1 at PageID 550.)

Petitioner argues that the TCCA's application of *Strickland* was unreasonable. (ECF No. 90 at PageID 3649.) He relies on his own testimony at the post-conviction hearing that Jefferson drove the car the night of the shooting, assisted in the crime and was fully cognizant of what was occurring. (*Id.* (citing ECF No. 86-33 at PageID 3497).) Petitioner contends that Abeles' failure to request the accomplice jury instruction under these circumstances was not a reasonable strategic

decision, but was, "on its face" ineffective assistance of counsel that prejudiced his case. (*Id.*)

Petitioner cites *State v. Robinson*, 239 S.W.3d 211, 225 (Tenn. Crim. App. 2006), to aver that, if

the facts about the witness's participation are clear, the trial court should determine whether the

witness was an accomplice, and if the facts are disputed about the witness's participation, the jury

should determine, as a question of fact, whether the witness was an accomplice. (ECF No. 90 at

PageID 3649, 3650.) Petitioner also cites *Leberry v. State*, No. M2007-01813-CCA-R3-PC, 2009

WL 112579, at *5 (Tenn. Crim. App. Jan. 14, 2009), to support his claim that counsel's

performance was deficient. (*Id.*)

Lastly, Petitioner contends that, given the facts adduced at the post-conviction hearing, the

TCCA's decision that he failed to carry his burden was wrong. (ECF No. 13-1 at PageID 550.)

Petitioner argues that fairminded jurists could disagree that the TCCA's decision conflicts with

*Strickland.* (*See* ECF No. 13-1 at PageID 551-52.) He claims that there is "no possibility" that

fair-minded jurists would agree that the TCCA's determination that it is plausible "that it was some

how (sic) beneficial to the defense, not to attack the credibility of Patrick Jefferson, by explaining

to the jury that he was liable under Tennessee State law as an accomplice, and thus he had an

inherent bias and motivation to paint Mr. Spencer in the worst light possible." (*Id.* at PageID 552.)

Respondent argues that the TCCA reasonably applied federal law and reasonably

determined the facts in light of the evidence presented when it rejected this claim. (ECF No. 87 at

PageID 3627.)

Recently, the TSC, in *State v. Thomas*, 687 S.W.3d 233 (Tenn. 2024), addressed the

accomplice-corroboration rule stating,

> It has long been a common law rule in our state that "evidence is insufficient to
> sustain a conviction" when the conviction is "solely based upon the uncorroborated
> testimony of one or more accomplices." "An accomplice is one who knowingly,
> voluntarily, and with common intent participates with the principal offender in the

commission of a crime." A witness qualifies as an accomplice if that witness "could be indicted for the same offense charged against the defendant." Our Court has described the accomplice-corroboration rule as follows:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration.

*Thomas*, 687 S.W.3d at 239–40 (citations omitted). The TSC abolished the common law accomplice-corroboration rule because it intrudes into the jury's role as a factfinder and now only requires the trial court to issue a cautionary jury instruction when accomplice testimony is presented. *Id.* at 244-45, 248.

In Petitioner's case, there was evidence that corroborated Jefferson's testimony. Jefferson was the driver of the car that Petitioner was riding in on the night of the shooting. In Petitioner's statement, he said that Jefferson was driving a gray Lincoln Town Car, and Morris was with them. (ECF No. 86-12 at PageID 2363-64.) Morris wanted to go by Delk's house and gave them directions and told Petitioner to "cut" through the backyard to get near the house. (*Id.* at PageID 2364-67.) Petitioner said that Jefferson "was just saying y'all shouldn't do it really that's what he was saying." (*Id.* at PageID 2368.) Petitioner said, "Pat was telling me naw don't do it . . .." (*Id.* at PageID 2371.) After the shooting, Jefferson took Petitioner home. (*Id.* at PageID 2374.) Petitioner gave the gun to Morris. (*Id.* at PageID 2369.)

Jefferson's police statement (*see* ECF No. 86-11 at PageID 2213-21) and his testimony at trial were similar. (*See* ECF No. 86-19 at PageID 2786-2827.) Jefferson testified that he was driving a Lincoln town car that night, and Petitioner and Morris were with him. (ECF No. 86-19 at PageID 2804.) They went to a party at Harvest Knoll, but they left because it was full. (*Id.* at PageID 2804-05.) Jefferson was going to meet his girlfriend after work at Petitioner's house. (*Id.* at PageID 2805, 2812.) Morris "was directing me through the community" telling Jefferson where to go. (*Id.* at PageID 2805-06.) Jefferson drove down a street past some parked cars, and Morris pointed out Delk's "car or something." (*Id.* at PageID 2806-08, 2810-11.) Jefferson was texting and driving, so he pulled over after leaving the cove. (*Id.* at PageID 2811-13.) Petitioner got out the vehicle, and Jefferson told Petitioner "[d]on't do nothing crazy" because Jefferson "[j]ust had a bad feeling." (*Id.* at PageID 2813.) Jefferson heard "like they was talking about something." (*Id.*) Petitioner got out the car for about five minutes and went toward the houses. (*Id.* at PageID 2815-16.) Jefferson heard a couple of gunshots, and Petitioner ran back to the car. (*Id.* at PageID 2816-17.) They drove off and went to Petitioner's house. (*Id.* at PageID 2817.) Jefferson testified that he never saw Petitioner with a weapon that night. (*Id.* at PageID 2817, 2824-25.)

As noted, Petitioner relies on *Leberry* where the TCCA found deficient performance in counsel not requesting the accomplice jury instruction. However, the TCCA did not find prejudice "in light of this court's prior determination that any error that the trial court may have committed in not giving an instruction on accomplice testimony was harmless." *Leberry*, 2009 WL 112579, at *5. In the subsequent federal habeas proceeding, the Sixth Circuit denied relief on Leberry's ineffective assistance claim. *See Leberry v. Howerton*, 583 F. App'x 497 (6th Cir. 2014). The Sixth Circuit said that accomplice testimony is sufficiently corroborated by evidence placing the defendant at the crime scene described by the accomplice. *Id.* at 501 (citing *State v. Barnard*, 899

S.W.2d 617, 626 (Tenn. Crim. App. 1994)).  Because Leberry's conviction rested on more than uncorroborated accomplice testimony, the Sixth Circuit found the state court's determination that there was no prejudice to be not contrary to or an unreasonable application of clearly established federal law and denied habeas relief.  *Id.* at 502.

In *Abdur'Rahman v. Carpenter*, 805 F.3d 710, 716 (6th Cir. 2015), the Sixth Circuit determined that an ineffective assistance claim for trial counsel's failure to request an accomplice jury instruction was not substantial under *Martinez v. Ryan*, 566 U.S. 1 (2012).  The Sixth Circuit noted that, under Tennessee law, a conviction cannot be based on the uncorroborated testimony of an accomplice and that there must be "independent evidence, however slight, from which the jury can infer that the defendant committed the crime."  *Abdur'Rahman*, 805 F.3d at 716.  The court said that Abdur'Rahman's codefendant was an accomplice and that the trial court should have instructed the jury that the accomplice's testimony had to be corroborated.  *Id*.  The court noted that, on direct appeal, the TSC had found that the evidence was sufficient to uphold the conviction. *Id*.  Because there was testimony from the surviving victim and physical evidence tying Abdur'Rahman to the crime, there was sufficient evidence to corroborate the accomplice's testimony.  Thus, any error of the trial court in not giving the instruction was harmless.  *Id*.  The Sixth Circuit also determined that Abdur'Rahman could not show prejudice from his trial counsel's failure to request the accomplice jury instruction.  *Id*.

As Petitioner has said, the only real issue at trial was intent.  Petitioner gave a statement to the police admitting that he was trying to shoot at Delk and that he gave the gun to Morris.  The TBI confirmed that the three cartridge cases were fired from the .40 caliber Smith and Wesson pistol found at Morris's home and that bullets recovered from the victim's head, the cove, and Delk's arm were consistent in shape, type, and design with the live rounds in that gun.  *See Spencer*

*I*, 2011 WL 6147012, at *6.  Delk and Nelson testified about the confrontation the week prior between Petitioner and Delk and the subsequent shooting at the Halloween party.  Petitioner's statement about Jefferson's involvement was consistent with Jefferson's police statement and trial testimony.  The TCCA determined that the evidence at both the first and second trials was sufficient to sustain the first degree murder conviction.  *See Spencer I*, 2011 WL 6147012, at *7-9; *see Spencer II*, 2014 WL 1410317, at *1-4.  Petitioner does not challenge the sufficiency determination in the federal habeas proceedings.

Further, in the post-conviction proceedings, Abeles testified "that it was questionable whether or not Mr. Jefferson was an accomplice."  *See Spencer III*, 2019 WL 1109831, at *3. Abeles considered Jefferson to be a very weak witness and believed that the accomplice instruction would bolster Jefferson's testimony because it corroborated Petitioner's videotaped statement.  *Id.* Abeles said that the instruction would have been "more harmful" than beneficial.  *Id.*  He noted that the other proof that substantiates the conviction was Petitioner's hour and fifteen minute long statement.  (ECF No. 86-33 at PageID 3516.)  Abeles also pointed to the prosecution's closing argument at the second trial which included a PowerPoint presentation in which the prosecution "proceeded to just bullet point, point after point after point that we went after that we thought was kind of weak but Mr. Spencer had testified to or on was on his particular statement." (*Id.* at PageID 3516-17.)  Abeles said he did not want to create a roadmap for the State's argument to allow them to say that accomplice testimony is not great but it is backed up by Petitioner's statement.  (*Id.* at PageID 3517.)  Abeles said, "There was also plain corroboration, that's the thing I was most afraid of." (*Id.*)  The TCCA found Abeles's explanation to be reasonable and part of sound trial strategy. *Id.* at 84.

Trial counsel's strategic choices made after thorough investigation of law and facts relevant are virtually unchallengeable. *See Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009). Abeles's decision not to request the accomplice jury instruction to keep from emphasizing the consistencies between Petitioner's statement and Jefferson's testimony was sound strategy. His performance was not deficient.

Petitioner has not shown prejudice where there was clear corroboration of Jefferson's testimony with Petitioner's statement, forensic evidence, and other testimony about the conflict between Petitioner and Delk that led up to the shooting. The TCCA's decision was not contrary to or an unreasonable application of clearly established Supreme Court precedent and was not based on an unreasonable determination of facts in light of the evidence presented.

Petitioner's ineffective assistance of trial counsel claims are without merit and **DENIED.**

## B. DUE PROCESS CLAIM

Petitioner alleges that his Fifth Amendment right to due process was violated by the trial court's admission of prejudicial firearms and ammunition that were unrelated and irrelevant to the murder charge. (ECF No. 1 at PageID 7.) Petitioner contends that although five firearms were recovered from Petitioner's and Morris's home, only one firearm, .40 caliber handgun, matched evidence obtained from the crime scene, and that the firearm was found at Morris's residence, not Petitioner's. (*Id.*) He argues that the State conceded that the admission of the firearms was in error, but that it was harmless error. (*Id.*) Petitioner contends that the admission of numerous firearms in the absence of a limiting instruction inflamed the passions of the jury and allowed the jury to consider the possession of numerous firearms as evidence of a propensity to commit violence. (*Id.*) Before trial, Petitioner's counsel filed a motion in limine based on Tennessee Rules of Evidence 401, 402, and 403 and argued that the weapons and ammunition were not relevant to

the case and that their introduction would be more prejudicial than probative.  (*See* ECF No. 13-1

at PageID 544-45.)  Petitioner contends that the trial court erroneously allowed the admission of

the weapons and ammunition into evidence.  (*Id.* at PageID 545.)

On direct appeal, the TCCA opined,

Appellant also argues that the trial court erred when it allowed certain handguns
and ammunition found during a search and unrelated to the victim's death into
evidence because the evidence was irrelevant.  The State concedes that the trial
court improperly allowed the introduction of the handguns and ammunition into
evidence but argues that the error was harmless.

The handguns and ammunition in question were discovered by officers as the result
of searches pursuant to search warrants of Appellant's house and Morris's house.
At Appellant's house, officers discovered a .32 caliber semiautomatic handgun, a
.177 caliber pellet pistol, a .22 revolver, a box of nine-millimeter ammunition, a
box of .32 caliber rounds, and a box of .380 automatic ammunition.  At Morris's
house they discovered a Bryco Arms .380 semiautomatic pistol and a loaded .40
caliber handgun.   The .40 caliber handgun was the only discovered weapon
connected to the murder.  It was determined to be the murder weapon by a TBI
forensic firearms examiner.

Prior to trial, Appellant filed a motion in limine to exclude the weapons and
ammunition.   Appellant argued that the introduction of the weapons and
ammunition was not relevant pursuant to Rules 401, 402, and 403 of the Tennessee
Rules of Evidence, and that even if they were relevant their introduction at trial
would be more prejudicial than probative.  The State argued that the weapons and
ammunition were part of its case.  According to the State, when the bullet was
removed from the victim during the autopsy, the weapons and ammunition were
sent to the TBI to be tested.  Also, the State said that it intended to introduce
testimony that all of the weapons and ammunition were found during the searches.

The trial court made the following ruling:

Okay.  I mean, I can, I guess kind of see splitting the baby.  I think the State
has the right to say that, you know, we did everything we could to have
everything tested thoroughly and can be shown to the witness, can be shown
to the witness, can be marked as evidence, but I don't see any reason that
guns that were not used on the night in question should be piled up on a table
and left there for the jurors to look at if they're not the gun in question.

I think they can be put in a bag and moved out of the way.  Frankly, I think
that is prejudicial.

And so, I certainly will allow the State to have items marked into evidence that they feel shows their case, but there's no reasons to leave something—a number of weapons just left out on the table like that in front of the jury throughout the entire trial.

And so, I think that's a fair balance between the two interests.
....
So, those weapons will be put in a bag or something else and they will be taken out of the jury's view after they're introduced.

When dealing with the propriety of evidence, the proposed proof must satisfy the threshold determination of relevancy mandated by Tennessee Rule of Evidence 401. This rule defines relevant evidence as that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Rule 403 adds that relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

We agree with the State's concession. The introduction of weapons and ammunition discovered at both Appellant's and Morris's houses that were not even related to the issue at hand was an abuse of discretion. We now turn to whether this requires a reversal of Appellant's conviction.

We note that Tennessee Rule of Appellate Procedure 36(b) states that "[a] final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). Our supreme court has given further guidance in these matters by stating that "the line between harmless and prejudicial error is in direct proportion to the degree ... by which the proof exceeds the standard required to convict." *Delk v. State*, 590 S.W.2d 435, 442 (Tenn. 1979); *see also, e.g., State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999).

In the case at hand, we conclude that the evidence was overwhelming so that the error was harmless. There was ample evidence presented that Appellant and Delk were engaged in an altercation a week before the death of the victim. Appellant shot Delk in the arm during the altercation. On the night in question, multiple witnesses stated that they saw a car matching the description of Jefferson's car. Jefferson admitted that he drove Appellant and Morris through the neighborhood on the night in question. Jefferson testified that Appellant and Morris were directing him to Delk's house which was in the same neighborhood as the victim's house. Jefferson stated that he told Appellant not to do anything stupid because Jefferson had a feeling that something bad would happen. Finally, Appellant admitted to officers during an interview that he went to the neighborhood that night

> to shoot Delk and that he indeed fired the gun.  This evidence when taken as a whole
> is overwhelming proof of Appellant's guilt.  We conclude that the admission of the
> weapons and ammunition, while error, did not contribute to the jury's verdict in the
> face of the overwhelming evidence of guilt.

*Spencer II*, 2014 WL 1410317,  at *5-7 (footnote omitted).

Petitioner asserts that the claim was fully litigated and exhausted on direct appeal.  (ECF

No. 1 at PageID 7.)  Petitioner contends that the TCCA's determination that the error was harmless

was an unreasonable application of *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), and was an

unreasonable determination of the evidence in light of the facts presented.  (ECF No. 13-1 at

PageID 546-47.)

Respondent argues that the due process claim was not fairly presented in the state court

and is procedurally defaulted because Petitioner filed a pretrial motion in limine citing state

evidentiary rules, and that on appeal, Petitioner raised this solely on state evidentiary rules, and

not due process.  (ECF No. 87 at PageID 3616-17.)  Respondent asserts that Petitioner no longer

has any state court remedies because of the statute of limitations and the one petition rule for post-

conviction relief.  (*Id.* at PageID 3617.)  Respondent argues that Petitioner has not presented an

argument that the procedural default should be excused.  (*Id.*)

In  Petitioner's  Reply,  he  asserts  that  Respondent's  argument  is  "a  fundamental

misinterpretation of the case."  (ECF No. 90 at PageID 3643.)  Petitioner contends that "[t]he fact

remains that the trial court prejudicially allowed the admission of firearms and ammunition that

were unrelated an irrelevant to the alleged offense" and that habeas review is proper.  (*Id.*)  He

contends that he has exhausted his state court remedies and that refusal of this claim would result

in a miscarriage of justice.  (*Id.* at PageID 3643-44.)  Petitioner contends that the issue is the trial

court's "erroneous characterization of the extreme prejudice that burdened Petitioner as a result of

having a series of weapons and ammunition incorrectly paraded out in front of the jury as a

'harmless' error." (*Id.*)  Petitioner contends that the TCCA's decision that it was harmless error was based on an unreasonable determination of facts in light of the evidence present.  (*Id.*)

On direct appeal, Petitioner framed the issue about admission of firearms and ammunition as "whether the trial court erred in admitting multiple firearms and ammunition collected in a search of two homes into evidence." (ECF No. 86-25 at PageID 3305.)  Petitioner cites to Tenn. R. Evid. 401, 402, 403, and 404 to argue that the firearms and ammunition collected in the search that are not related to Baker's murder are not relevant.  (*Id.* at PageID 3305-11.)

Petitioner did not fairly present a constitutional due process claim in the state court; the TCCA addressed the claim based on state evidentiary rules.  *See Spencer II*, 2014 WL 1410317, at *5-7 (footnote omitted).  Petitioner's habeas due process claim is procedurally defaulted. Petitioner has not shown cause and prejudice to overcome the procedural default.  Although Petitioner asserts that it would be a miscarriage of justice for the Court to not consider his claim, he has made no argument to show why he could not have framed his argument as a due process violation in the state courts.  The Court does not find a miscarriage of justice because Petitioner, by his own admission, was shooting at Delk the night Baker was killed.  Petitioner has not shown that he is actually innocent.

To the extent Petitioner contends that the TCCA's decision was based on an unreasonable determination of facts (*see* ECF No. 90 at PageID 3644), that analysis only applies when the claim was adjudicated on the merits in the state court.  *See* 28 U.S.C. § 2254(d).  Petitioner's constitutional due process claim was not.

Further, a federal court may entertain an application for a writ of habeas corpus on behalf of a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Generally, state evidentiary issues are not

cognizable on federal habeas review. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). A federal court may grant relief where the state's evidentiary ruling is so fundamentally unfair that it rises to the level of a due-process violation. *Stewart v. Winn*, 967 F.3d 534, 540 (6th Cir. 2020). State statutes and rules, not the Due Process Clause, ordinarily govern the admissibility of evidence in state criminal trials. *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012). Moreover, such rulings "are usually not to be questioned in a federal habeas corpus proceeding." *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *see Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983) ("[such] errors ... especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus"). If a ruling is especially egregious and "results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003) (citing *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001)). Importantly, however, as a general matter, "state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour*, 224 F.3d at 552 (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)). Ultimately, states have wide latitude with regard to evidentiary matters under the Due Process Clause. *Id*.

To succeed under § 2254(d)(1), a petitioner must identify a Supreme Court case that addresses the "specific kind of evidence" challenged. *Stewart*, 967 F.3d at 538. Petitioner has not identified a Supreme Court case addressing the specific evidence challenged. The admission of the other weapons and ammunition did not make Petitioner's trial fundamentally unfair given the overwhelming evidence of Petitioner's guilt. *See Anderson v. Sternes*, 243 F.3d 1049, 1054-55 (7th Cir. 2001) (finding no due process violation for introduction of weapons found pursuant to a

lawful search of defendant's girlfriend's apartment); *see McLeod v. McDowell*, No. CV 15-06466-MWF-KES, 2016 WL 11757698, at *22 (C.D. Cal. Oct. 11, 2016), *report and recommendation adopted*, 2017 WL 11647844 (C.D. Cal. Mar. 9, 2017) (denying habeas relief for admission of firearms and ammunition not related to the crime because "Petitioner is unable to point to any U.S. Supreme Court case holding that the admission of bad character or propensity evidence violates a criminal defendant's federal constitutional due process right to a fair trial").

Petitioner's due process claim is procedurally defaulted because it was not fairly presented in the state court and is without merit.

## VI.  CONCLUSION

Because the clams in the § 2254 Petition are without merit and/or procedurally defaulted, the Court **DENIES** the § 2254 Petition.   The § 2254 Petition is **DISMISSED WITH PREJUDICE**.  Judgment shall be entered for Respondent.

## VII.  APPEAL ISSUES

Twenty-eight U.S.C. § 2253(a) requires the district court to evaluate the appealability of its decision denying a § 2254 petition and to issue a certificate of appealability ("COA") "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *see also* Fed. R. App. P. 22(b).  The COA must indicate the specific issue or issues that satisfy the required showing. 28 U.S.C. §§ 2253(c)(2) & (3).  No § 2254 petitioner may appeal without this certificate.  28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).

A "substantial showing" is made when the movant demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotation marks omitted).

> Where a district court has rejected a constitutional claim on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. . .. When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. . ..

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "In short, a court should not grant a certificate without some substantial reason to think that the denial of relief might be incorrect." *Moody v. United States*, 958 F.3d 485, 488 (6th Cir. 2020). "To put it simply, a claim does not merit a certificate unless *every independent reason to deny the claim is reasonably debatable*." *Id.*; *see also id.* ("Again, a certificate is improper if *any* outcome-determinative issue is not reasonably debatable.").

In this case, there can be no question that the § 2254 Petition has claims that are without merit or procedurally defaulted. Because any appeal by Petitioner on the issues raised in his § 2254 Petition does not deserve attention, the Court **DENIES** a certificate of appealability.

Rule 24(a)(1) of the Federal Rules of Appellate Procedure provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. However, if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal *in forma pauperis*, the prisoner must file his motion to proceed *in forma pauperis* in the appellate court. *See* Fed. R. App. P. 24(a) (4)-(5). In this case, for the same reasons the Court denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith. It is therefore **CERTIFIED**, pursuant to Federal Rule of

Appellate Procedure 24(a), that any appeal in this matter would not be taken in good faith.  Leave to appeal *in forma pauperis* is **DENIED**.[9]

        **IT IS SO ORDERED** this 27th day of February, 2025.

*s/John T. Fowlkes, Jr.*
JOHN T. FOWLKES, JR.
United States District Judge

---

[9] If Petitioner files a notice of appeal, he must pay the full $605 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of Appeals within 30 days of the date of entry of this order.  *See* Fed. R. App. P. 24(a)(5).